[Crim. No. 3430. In Bank.—November 30, 1931.]

THE PEOPLE, Respondent, v. VICTOR FAROLAN, Appellant.

No appearance for Appellant.

U. S. Webb, Attorney-General, Ralph O. Marron and Emery F. Mitchell, Deputies Attorney-General, Fred L. Thomas, District Attorney, and H. S. Bridges, Assistant District Attorney, for Respondent.

SEAWELL, J.—The defendant, a native of the Philippine Islands, and whose true name seems to be Santos Amigay, was charged by an information filed in the Superior Court of the County of Santa Clara with the crime of having on August 9, 1930, murdered one Damaso Mangna. The jury impaneled to try the case found him guilty of murder in the first degree, without making any recommendation as to penalty, and such a verdict carries with it, by operation of law, the imposition of the death penalty. He has appealed to this court from the judgment pronouncing the death penalty upon him, but his counsel has filed no brief in his behalf. We have, nevertheless, made thorough examination of the record, including the transcript of testimony, without receiving any suggestion of aid from counsel as to whether or not defendant had suffered any material injury or the denial of any right which the law

guarantees to persons charged with crime. The defendant being unable to provide himself with counsel, the court appointed one to defend him. Under the rule we would be justified in dismissing the appeal without examination into the record, but by reason of the fact that the extreme penalty of the law was imposed upon the defendant, we have felt constrained to go fully into the merits of the trial. The same jury which found the defendant guilty of first degree murder disagreed as to the issue of insanity interposed by him and another jury impaneled to try said issue of insanity found against defendant on his said plea of insanity at the time the homicide was committed.

The defendant and six or seven of his countrymen were engaged approximately two weeks before the homicide was committed in picking prunes and tomatoes on a ranch owned by one Silacci. The defendant, the deceased and several other Filipinos lived in a small primitive building on said premises which comprised a kitchen, dining-room and at least two sleeping rooms. The homicide was committed approximately at 6 o'clock P. M., Saturday, August 9, 1930, the pickers having quit work at 5 o'clock P. M. on that day. Vidal Contarno, Santiago Cabanis, Victor Farolan, the defendant, and the deceased immediately at the close of their labor returned to their living quarters. Others went to town and did not return until shortly after the homicide. Contarno, Cabanis and the defendant sat down at the dinner table a little before 6 o'clock, while the deceased went into the kitchen and took a bath. He and the defendant were apparently not on friendly terms. Upon finishing his bath, the deceased, clad in his underclothing, walked from the kitchen through the dining-room into his bedroom. As he passed through the dining-room Santiago Cabanis asked or invited him to sit down and join them at the table. The deceased replied that he would as soon as he could dress. The defendant was silent during the time he was at the table. Soon after the deceased passed to his room, the defendant left the dining-room and went to his own room, which was located adjacent to the decedent's room. An open door space not furnished with a door connected the two rooms. Very shortly after the defendant left the dining-room, a shot was heard by Contarno and Cabanis, who proceeded to the room occupied by the deceased. He was found seated on a cot leaning

forward in a dazed condition. The defendant was standing over the deceased, holding a revolver in his left hand, and was violently beating the deceased upon the head and body with an inch and a quarter iron pipe, approximately eighteen inches in length, which he held in his right hand.

The shot aimed at the deceased had missed its mark. As Contarno and Cabanis were observed entering the room, he fired two shots at them, neither of which hit its mark, and he then pursued Contarno into the dining-room, where Contarno took refuge under a table. Driven from this position, Contarno seized a tomato box, which was conveniently near, and protected himself by using it as a shield against the violent assault made upon him by the defendant as well as he was able until the struggle was brought to an end by defendant being pushed out of the door to the ground below, which was some three feet lower than the floor level. Contarno, who had received several injuries upon the head and body, and Cabanis escaped by flight. After Contarno made his escape the defendant was seen by his associates and companions in pursuit of him, armed with pistol and iron pipe, threatening to kill him if he met up with him.

The autopsy showed that the deceased had received a number of blows upon the head and body, and that death was caused by a blow which produced a fracture of the skull.

The cause of the violent outbreak of the defendant is not very clearly brought out by the evidence. There is evidence as to the motive or exciting cause to the extent that one Captain Oso and defendant had been convicted of some offense committed in the Philippine Islands, and had served jail sentences thereon, and that the defendant during the day had heard the deceased and Contarno speaking about the defendant's trouble in the islands.

The defendant was known to own a pistol. The iron pipe with which he committed the homicide had been noticed in his room by his countrymen prior to the assault. He said that these weapons were not for them, but for a Filipino whom he first knew in Marysville, and with whom he seemed to have had trouble a short time before the homicide. In fact said Filipino became apprehensive for his safety and left the locality.

The foregoing is a substantial *résumé* of the evidence introduced on the part of The People. The defendant offered no evidence in his own behalf upon the trial for homicide, but did offer evidence at the two trials upon the issue of his sanity.

■ If the defendant was legally responsible for his act, there can be no doubt as to the justice of his conviction. The degree of punishment was left entirely to the discretion of the jury. No question is or can be raised as to the fairness of the court's charge. In fact the court throughout the trial exhibited that consideration for the defendant's rights which should always become trial courts in cases where the taking of human life is, under the law, committed to the discretion of human tribunals.

■ Upon a motion for a new trial defendant insisted that the extreme penalty should not have been imposed upon the defendant by reason of the mental deficiencies with which it is claimed he is affected. It was argued by defendant's counsel upon the motion for a new trial that the jury, which was told by the trial judge at the outset that if it found the defendant guilty of murder, it would also be retained to try the issues of insanity, would not have visited the extreme penalty upon the defendant had it known that there was a possibility of that issue being submitted to another jury. In short, it was the claim of counsel that the jury would not have returned a verdict which carried the death penalty had it known that the issue of insanity might, under any contingency, be determined by any other body than said jury selected to try the defendant on the murder charge. In other words, appellant's argument was that because of its supposed power to nullify the verdict rendered in the murder charge by finding the defendant not guilty by reason of insanity, it did not give the serious consideration to its verdict that it would have received had it known that there was a possibility of the issues of insanity being taken from its control. Counsel for defendant made the statement at the hearing of said motion that the jurors had entered into an understanding during the trial of the murder charge that they would find the defendant not guilty by reason of insanity on the final issue, but finally two or three jurors receded from their

agreement, leaving nine voting for not guilty by reason of insanity, and three against the plea of insanity.

No attempt was made to impeach the jury's verdict and there is nothing in the record whatever which tends to sustain counsel's mere statement or conjecture.

It seems unthinkable that a jury which was instructed as was the jury in the instant case as to its right to relieve the defendant of the extreme penalty of the law if in the exercise of its discretion it was proper to do so, would, under any circumstances, consent to the infliction of the highest degree of punishment known to the law when it was within its power to have relieved the accused of said extreme penalty.

As to the homicide having been committed by the defendant, there is no ground for controversy, counsel for defendant being forced by the overwhelming volume of evidence to admit it. His defense below was directed to the sanity of the defendant. A number of the countrymen of defendant were called and testified as to defendant having been injured by the fall of a horse which he was handling and also by a spell of typhoid fever which he suffered, both of which occurred some years ago in the Philippine Islands. It was claimed that he underwent changes thereafter which were described as ''talking to himself'', spells of depression and fearfulness, and some acts which would in a small way indicate delusions. Some four or five days after he was placed in jail his demeanor, which had theretofore been normal, radically changed and became such as to attract the attention of an officer connected with the sheriff's office, and the county probation officer, who, basing their opinion on the defendant's conduct for a period beginning some several days after his incarceration and continuing for some time thereafter, were of the opinion that the defendant was not normal, or, as they put it, not ''mentally right''.

The trial judge summoned two alienists, one connected with the State Hospital at Agnew and the other a practicing physician at San Jose, who, upon making studies of the defendant and his family history, expressed themselves as being entirely satisfied that he was sane. Applying the standard by which legal responsibility is measured in cases of homicide, the defendant cannot escape responsibility for

his act. From the first he denied that he had killed the deceased and attempted to cast suspicion upon Contarno by claiming that Contarno committed the deed.

Upon the record this court cannot interfere with the punishment fixed by the judgment, as there appear to be sufficient legal grounds upon which the judgment may properly be sustained.

Judgment affirmed.

Richards, J., Shenk, J., Waste, C. J., Curtis, J., and Preston, J., concurred.