UNITED STATES of America

v.

Wilfredo ALVAREZ et al.

Appeal of John a/k/a Jorge MARTINEZ.

No. 74–1933.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1975.

Decided June 11, 1975.

As Amended July 16, 1975.

Thomas F. Campion, Shanley & Fisher, Newark, N. J., for appellant; Mark W. Hoffman and Robert A. Boutillier, Newark, N. J., on the brief.

Jonathan L. Goldstein, U. S. Atty., John J. Barry, Asst. U. S. Atty., Newark, N. J., for appellee.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

John Martinez appeals from a judgment of sentence of 25 years imprisonment entered upon his conviction for kidnapping and conspiracy to kidnap. He is one of seven defendants named in an indictment returned on March 19, 1974 for kidnapping for ransom of John Calzadilla. Two of the seven were adjudged juvenile offenders before trial. At trial one defendant, Alvarez, was acquitted. The remaining four were convicted. The convictions of two, Fernandez (No. 74–1931) and Roberto E. Martinez (No. 74–1934) have been affirmed in separate judgment orders of this court filed simultaneously with this opinion. Also, a separate opinion in the case of Hernandez (No. 74–1932) is being filed on this date. Prior to the trial John Martinez raised the question of his competency to stand trial. In a preliminary hearing the district court found him to be competent, and he concedes that there were no errors affecting that finding. At the trial John Martinez relied upon the defense of insanity as defined for this circuit in *United States v. Currens,* 290 F.2d 751 (3d Cir. 1961). On appeal

he urges, among other things, that the court erred in admitting the testimony of two psychiatrists. We agree, and thus we reverse his conviction and remand for a new trial.

The district court, with the consent of all the defendants except Hernandez, ruled that the issue of participation in the kidnapping would be tried separately. If the jury found that John Martinez had participated, then evidence would be received on the insanity issue. The jury did find that he participated. The trial then proceeded before the same jury for a determination of his sanity at the time of the kidnapping. By agreement of the parties John Martinez presented his case first. This consisted of live testimony by his sister, and by Dr. Chester L. Trent, a psychiatrist. There was also a stipulation as to what Margarete Jurick, Senior Psychologist at Kings County Hospital, Brooklyn, New York, would testify to concerning her examination of John Martinez reported on April 14, 1974. Dr. Trent's testimony established, *prima facie,* that John Martinez lacked substantial capacity at the time of the kidnapping, as a result of a disease or defect, to conform his conduct to the requirements of the law. The government called three psychiatrists. As to two of these, John Martinez contends that admission of their testimony over strenuous objection was error.

## DR. FLICKER'S TESTIMONY

Thomas F. Campion, Esq. was appointed counsel for John Martinez pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A on March 26, 1974. Shortly thereafter he met with his client at the Federal House of Detention in New York City. As a result of that meeting he moved, pursuant to 18 U.S.C. § 3006A(e), for authorization to obtain the services of a psychiatrist, Dr. Chester Trent. Such authorization was granted. As a result of Dr. Trent's examination of John Martinez, Mr. Campion moved for a pretrial hearing to determine whether his client was so mentally incompetent as to be unable to understand the pro-

ceedings against him or properly to assist in his own defense. That motion, filed on April 10, 1974, was returnable on April 29th. However, on April 11, 1974, the district court on its own motion entered an order providing *inter alia:*

"Upon the motion of the Court and with the consent of the United States Attorney . . . and the consent of counsel for the defendant Martinez . . .,

It is this 11th day of April, 1974 ORDERED that Dr. David J. Flicker be and hereby is appointed pursuant to Title 18 U.S.C., Section 4244, to conduct a psychiatric examination of defendant John Martinez on April 13, 1974, . . .

. . . . .

ORDERED that all reports regarding John Martinez by the psychiatric experts employed by the United States and by counsel for the defendant John Martinez be submitted to the Court with copies to opposing counsel on or before April 19, 1974 . . . ." (App. for John Martinez at 37a).

The order is unequivocally clear. The sole purpose of Dr. Flicker's appointment was to conduct the examination authorized by 18 U.S.C. § 4244.[1] That section permits the court to compel a defendant to submit to a psychiatric examination solely for the purpose of aiding in the determination of his present capacity to understand the proceedings against him or properly to assist in his own defense. Since a psychiatric examination inevitably involves verbal communications, the statute presents the possibility of compelled self-incrimination. But the fruits of the examination are expressly limited:

"No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding."

In view of this explicit language, the recital in the April 11, 1974 order that it was consented to by Mr. Campion adds nothing. Defense counsel are encouraged to consent to an examination which otherwise may be compelled on the assurance that nothing their client says to the psychiatrist may be used against him on the issue of guilt. The examination by Dr. Flicker was solely for a § 4244

---

1. "Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury."

inquiry into present competency and was consented to solely for that purpose.

The court's psychiatrist, Dr. Flicker, found John Martinez to be competent and so reported. A psychiatrist selected by the government, Dr. Schwartz,[2] reported that as a result of mental disease Martinez lacked capacity to assist in his own defense. Shortly thereafter, and on the government's motion, an order was entered sending John Martinez to the Medical Facility for Federal Prisoners at Springfield, Missouri for a determination of his competency to stand trial. The psychiatric staff at Springfield reported that he was competent. A § 4244 hearing was held by the court on May 30 and 31 at which hearing several psychiatrists who had examined Martinez testified with respect to his competency to stand trial. The court concluded that John Martinez was competent.

At the trial on the issue of John Martinez's sanity at the time of the kidnapping, and over objection, the court permitted Dr. Flicker to testify that the *Currens* test was met. He was quite clearly the most effective government witness on that issue, and he recounted statements made by John Martinez that, while he denied involvement in the crime, "he knows that it was wrong." (Tr. at 3400).

The government defends the use of Dr. Flicker's testimony on three grounds: (1) that the April 11, 1974 order should be deemed to have been made pursuant to the court's "inherent power" to order a psychiatric examination on the *Currens* issue as well as on the issue of present competence; (2) that the prohibition in § 4244 against use of statements elicited from the defendant applies only to admissions of participation in the crime and not to admissions bearing on sanity; and (3) that even if § 4244 was violated, the error was harmless.

Whatever "inherent power" courts may possess to order a defendant to submit to a psychiatric examination for the purpose of assisting the government in meeting its burden of proof under *United States v. Currens, supra,* the short answer to the government's first contention is that in this case the district court did not make any such order. The defendant was ordered to submit to a § 4244 examination by Dr. Flicker, and no other. Had he been informed in advance that Flicker's examination was to serve a dual purpose, we must assume that Mr. Campion would have objected rather than consented to the court's order. Had such an order been entered over his objection, use of the psychiatrist's testimony would confront us with a fifth amendment problem of no little difficulty. Some courts have said, either expressly or implicitly, that a court may compel a defendant to submit to a psychiatric examination for the purpose of determining his sanity at the time of the offense, and that the prosecution may use the psychiatrist's testimony at the trial.[3] A considerable literature questioning and criticizing the propriety of

---

**2.** On the application of the United States Attorney the court directed that John Martinez be transported to Kings County Hospital on April 15, 1974 for a psychiatric examination by Dr. Daniel Schwartz. This order does not refer to § 4244, but obviously was entered pursuant to that statute, since Dr. Schwartz's report as well as Dr. Flicker's were referred to when the court, on the application of the United States Attorney, in April 1974, ordered John Martinez transported to the Medical Facility for Federal Prisoners at Springfield, Missouri for a ten-day study "for the purpose of ascertaining his mental competence to stand trial." This order recites that it is made "pursuant to Title 18, United States Code, Section 4244."

**3.** *See, e. g., United States v. McCracken,* 488 F.2d 406 (5th Cir. 1974); *United States v. Barrera,* 486 F.2d 333, 338–39 (2d Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974); *United States v. Mattson,* 469 F.2d 1234, 1236 (9th Cir. 1972), cert. denied, 410 U.S. 986, 93 S.Ct. 1513, 36 L.Ed.2d 183 (1973); *United States v. Julian,* 469 F.2d 371, 375–76 (10th Cir. 1972); *Edmonds v. United States,* 106 U.S.App.D.C. 373, 273 F.2d 108, 114 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960).

this kind of procedure has developed.[4] This circuit is committed to the position that use at trial of statements exacted by the compulsion of a court ordered psychiatric examination, at least where any statement elicited in the examination tends to establish the fact of the offense or the voluntariness of other statements by the accused, is a violation of the privilege against self-incrimination. *United States ex rel. Smith v. Yeager*, 451 F.2d 164 (3d Cir.), *aff'g.* 336 F.Supp. 1287, 1305 (D.N.J.1971).[5] We have also held that sanity, as defined in *United States v. Currens, supra*, is a matter going to guilt or innocence which the government must prove beyond a reasonable doubt. *Government of the Virgin Islands v. Bellott*, 495 F.2d 1393 (3d Cir. 1974). Faced with the *Smith* and *Bellott* precedents it would be quite difficult to hold that statements elicited in a compelled psychiatric examination could be used to establish sanity, and thus guilt, even when the statements in no way suggested participation in the offense.[6] *But cf. United States v. Albright*, 388 F.2d 719 (4th Cir. 1968).

But we need not decide in this case whether the fifth amendment would prohibit the use, solely on the *Currens* issue, of statements elicited under the compulsion of a court order. No order was entered except the one authorized by § 4244. Thus we may confine our holding to the proper interpretation of that statute.

■ That brings us to the government's second contention, that the prohibition on use of statements by the accused in the course of a § 4244 examination "on the issue of guilt in any criminal proceeding" should be read narrowly so as to permit such use on the *Currens* issue, but not to establish the defendant's participation. Such a construction of the statute would, of course, present the same constitutional issue discussed above with respect to any order issued pursuant to the court's "inherent powers." We think, however, that Congress in drafting § 4244 had in mind the avoidance of that very issue. The only reasonable construction of the section is that the fruits of the compelled examination, whether they be psychiatrist's opinions or defendant's statements, may be used in the § 4244 hearing only, and not at the trial.

Section 4244 was enacted in 1949, Act of Sept. 7, 1949, ch. 535, 63 Stat. 686. That law, comprised of five sections, dealt comprehensively for the first time with the care and custody of insane persons charged with or convicted of offenses against the United States. It did not deal with the trial of offenders. Prior to 1949 few federal statutes dealt with the problems presented when insane persons were charged with crime. Chief among these (and perhaps the only enactments) were the Act of Feb. 7, 1857, ch. 36, § 5, 11 Stat. 158, *as amended*, 24 U.S.C. § 211 and the Act of June 23, 1874, ch. 465, § 1, 18 Stat. 251, *as amended*, 24 U.S.C. § 212. Because of rulings by the United States Attorney General[7] and of federal practice no adequate means was provided for dealing with the confinement of insane persons accused of crime outside the Armed

---

4. For two probing analyses of the problem see Danforth, Death Knell for Pre-Trial Mental Examination? Privilege Against Self-Incrimination, 19 Rut.L.Rev. 489 (1965); Note, Requiring a Criminal Defendant to Submit to a Government Psychiatric Examination: An Invasion of the Privilege Against Self-Incrimination, 83 Harv.L.Rev. 648 (1970).

5. Certiorari was denied, 404 U.S. 859, 92 S.Ct. 112, 30 L.Ed.2d 101 (1971).

6. Some of Dr. Flicker's testimony might well have suggested to the jury knowledgeable participation by John Martinez. That testimony falls squarely within the holding of the *Smith* case, but because the trial was bifurcated it could not have prejudiced the defendant on the issue of his participation. Thus we are not presented with the question discussed in the leading case of *State v. Whitlow*, 45 N.J. 3, 210 A.2d 763 (1965) of whether a limiting instruction cures otherwise questionable use of compelled admissions dealing with participation which were made to a psychiatrist when those admissions are presented to the jury, in a unitary trial, only on the issue of insanity.

7. *See, e. g.,* 17 Op.Att'y Gen. 251 (1874).

Forces or the District of Columbia. Neither established a procedure for determining the mental competence of an accused to stand trial, or a means for caring for a possible incompetent pending trial. No statutory procedures existed for the indefinite commitment of a dangerous accused person who was incompetent to stand trial. As a result of the latter deficiency many incompetent federal defendants were often simply tried and convicted.[8] There was no statutory authority to hold past the expiration of his sentence any prisoner who became insane while in prison.[9]

In 1942 the Judicial Conference of the United States authorized the Chief Justice to appoint a committee which would, in cooperation with the Attorney General, study the treatment accorded by the federal courts to insane persons charged with crime. This committee submitted a report to the September 1945 session of the Judicial Conference. Included in the report was a draft bill incorporating most of the provisions now found in 18 U.S.C. §§ 4244-48. As amended the draft bill was approved by the Conference in 1947 and in 1948. The Judicial Conference bill was introduced in the 80th Congress as S. 850, and hearings were held on it by the Subcommittee of the Senate Judiciary Committee. Hearings on S. 850 before the Subcomm. of the Senate Comm. on the Judiciary, 80th

Cong., 2d Sess. 7, 8 (1948). The bill passed in the Senate but not in the House. It was reintroduced in the 81st Congress as S. 936, and adopted in form virtually identical with that approved by the Judicial Conference. Act of September 7, 1949, ch. 535, 63 Stat. 686, *codified in* 18 U.S.C. §§ 4244-48. These sections remain unchanged since passage. Section 4244 provides a procedure for determining competency to stand trial; § 4245 provides for a government initiated postconviction proceeding to determine competency of prisoners whose alleged mental incompetency was undisclosed at trial; and § 4246 provides for commitment to the custody of the Attorney General of persons found incompetent pursuant to § 4244 or § 4245 until they become competent to stand trial or the charges against them are "disposed of according to law." The remaining two sections deal with procedures for custody of incompetents at the expiration of sentences or commitments.

The next to last sentence of § 4244, restricting the use which may be made of statements by the accused in the course of any examination, appeared in its present form in the Judicial Conference bill,[10] in bill S. 850 in the Eightieth Congress and in bill S. 936 which was enacted. The last sentence, prohibiting use against the accused at trial of a finding that he is competent to stand

---

8. Hearings on S. 850 before the Subcomm. of the Senate Comm. on the Judiciary, 80th Cong., 2d Sess. 5 (1948) (Hearings). Then Attorney General, Justice Tom C. Clark, had the following to say in a letter to Senator Alexander Wiley commenting on S. 850, 80th Cong., 2d Sess. (1948), a bill substantially identical to the one passed in 1949:

"A disturbing number of persons are being sentenced for Federal offenses and sent to prison who, because of insanity, should not have been convicted and who, because of their mental incapacity to participate rationally in their defense, should never have been brought to trial."

"Of course, conviction of an insane person is void and open to attack on habeas corpus. Federal statutes, however, prescribe no procedure for determining the accused's mental competence to stand trial."

Letter from Justice Tom C. Clark to Hon. Alexander Wiley, in S.Rep.No.1511, 80th Cong., 2d Sess. 2 (1948).

9. Hearings, *supra* note 8, at 7. While the language of 24 U.S.C. § 212 and its predecessors would seem to have authorized detention of such prisoners, the Attorney General long ago refused to read the statute so broadly. Rather, he issued an opinion in which he stated that detention past sentence expiration was unauthorized. 30 Op.Att'y Gen. 569, 571 (1916); *see* 35 Op.Att'y Gen. 366, 369 (1927). In 1930, Congress specifically limited psychiatric detention to the maximum time for which sentence had been imposed. After that time had run, the statutes directed that the prisoner be delivered to state authorities. Act of May 13, 1930, ch. 254, §§ 6-8, 46 Stat. 271-72, *as amended,* 18 U.S.C. § 4241-43.

trial, was added as an amendment to bill S. 850 by the Senate Judiciary Committee. The report accompanying the bill states: "the purpose of the amendments is to give adequate assurance to the accused person that his right to plead insanity will be protected."[11]

It it quite clear that the object of the bill was not to provide to the government a new means for obtaining evidence for use at the trial. Structurally, §§ 4244, 4245 and 4246 deal with competency to participate in a trial, while §§ 4247 and 4248 deal with prisoners who, though sane when tried, become insane in prison. It is significant that the hearing on a § 4245 application is conducted "in accordance with the provisions of § 4244," and thus subject to the limitations of the last two sentences of that section, while no such cross reference is made in § 4247 or § 4248. Obviously the last two sentences in § 4244 were intended for the protection of the particular interests of an accused who still faced the possibility of a trial. Chief among those particular interests is the privilege against self-incrimination. The only reasonable interpretation of the statute is that the fruits of a defendant's compelled disclosures may be used in determining his competency to stand trial but may not be used against him at the trial. Nothing in the legislative history of bill S. 936 or its predecessors, or in the plain text of the statute suggests otherwise.

We are advised that United States attorneys have frequently sought § 4244 examinations specifically for the purpose of obtaining evidence on the issue of criminal responsibility in order to rebut anticipated insanity defenses, and that this practice is in accordance with the policy of the Criminal Division of the Justice Department.[12] This use of § 4244 seems to us entirely inconsistent with its limited purpose. We construe the statute to mean what it appears to say. A defendant may be compelled to submit to a psychiatric examination for the purpose of determining his competency to stand trial, and the psychiatrist can testify at a hearing for that purpose. But that psychiatrist cannot, if the defendant is found to be competent, testify against him at the trial about statements he made in the course of the compelled examination.

Since the only examination made by Dr. Flicker was made pursuant to a § 4244 order, the statements made by John Martinez in the course of that examination were inadmissible against him at the trial. See United States v. Malcolm, 475 F.2d 420, 427 (9th Cir. 1973); United States v. Driscoll, 399 F.2d 135 (2d Cir. 1968). Because Dr. Flicker's appointment was limited to a § 4244 examination we have no occasion, in this case, to pass upon the power of the court to compel a defendant to submit to a psychiatric examination for the purpose of providing evidence by which the govern-

10. A change in the language of what is now § 4244, took place between the proposal which accompanied the 1945 report to the Judicial Conference, and the one which accompanied the 1946 report. The change was apparently in response to criticism solicited from district and circuit judges. We have been unable to locate the reason for that change, although it hardly can be considered significant since the committee characterizes the criticisms as "suggestions for improvements in detail" and nothing more. Report of Committee to Study Treatment Accorded by Federal Courts to Insane Persons Charged With Crime page 2 (1946). The 1945 version read as follows:

"No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this sec-

tion, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused in any criminal proceeding."
Report of Committee to Study Treatment Accorded by Federal Courts to Insane Persons Charged With Crime § 1, at 22 (1945). The 1946 version is identical to the one in § 4244.

11. S.Rep.No.1511, 80th Cong. 2d Sess. 1 (1948).

12. See U.S. Dep't of Justice, Memo # 534, from Fred M. Vinson, Jr., Assistant Attorney General, Criminal Division, to all United States Attorneys (Jan. 16, 1968), referred to in Report of the Intra-Department Committee to Revise Chapter 313, Title 18, United States Code 5.

ment can meet its burden of proving sanity within the meaning of *United States v. Currens, supra.* And because the order here was only a single purpose order we are not in this case required to determine whether, as some cases suggest, a dual purpose order is permissible. One significant argument in favor of an interpretation of § 4244 as prohibiting such an order is that it prevents the court from putting defense counsel in the tactical dilemma of limiting cross-examination as to the basis of the psychiatrist's opinion or running the risk that such cross-examination will open the door to testimony about the defendant's compelled statements.

■ The government's final contention is that the admission of Flicker's testimony was harmless error. Our examination of the record convinces us otherwise. Flicker was the only doctor who examined John Martinez who did not find some evidence of mental illness, and he was the only witness who challenged the genuineness of the defendant's claimed amnesia.

The admission of Dr. Flicker's testimony was error and requires a new trial.

## DR. SADOFF'S TESTIMONY

■ After the § 4244 hearing in which the district court concluded that John Martinez was competent to stand trial his attorney applied, pursuant to 18 U.S.C. § 3006A(e), for authority to retain Dr. Robert Sadoff to conduct another psychiatric examination. The court authorized his retention, he conducted an examination, and he prepared a report in letter form addressed to Mr. Campion. A copy of the report, although made for and addressed to defense counsel, was turned over to the government pursuant to an order dated May 6, 1974, the last paragraph of which provided:

"AND IT IS FURTHER ORDERED that the Government and this defendant exchange copies of results or reports of physical or mental examinations of the defendant, and of scientific tests or experiments made in con-

nection therewith." (App. for John Martinez at 55a).

The May 6, 1974 order was made upon a motion by John Martinez's attorney for discovery and inspection pursuant to Rule 16, Fed.R.Crim.P. and for a bill of particulars. It granted mutual discovery in several respects and it was consented to by the United States Attorney.

The report revealed Dr. Sadoff's opinion:

"With respect to his state of mind at the time of the alleged offense, it is my opinion that he was disturbed, was depressed, but did know the nature and quality of his act, did know that he was doing what was wrong and did not lack substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." (App. for John Martinez at 72a).

The government subpoenaed Dr. Sadoff. Defense counsel moved to quash the subpoena. The court denied this motion and permitted Dr. Sadoff to testify over objection. That objection was based on the fifth amendment privilege against self-incrimination, the sixth amendment right to effective assistance of counsel, and the attorney-client privilege. The government contends that there is no fifth amendment issue and that any sixth amendment or attorney-client privilege was waived. We agree that because the disclosures made to Dr. Sadoff were entirely voluntary the privilege against self-incrimination is not relevant. The sixth amendment attorney-client issue is more difficult.

■ *United States v. Kovel,* 296 F.2d 918 (2d Cir. 1961) holds that communications to an accountant, in confidence, for the purpose of obtaining legal advice from a lawyer are protected by the attorney-client privilege. No federal case has been called to our attention applying the same rule to a medical expert retained to assist an attorney in preparation for trial. Some state courts have considered the question. *See, e. g., State v. Kociolek,* 23 N.J. 400, 129 A.2d 417

(1957); *San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951). We see no distinction between the need of defense counsel for expert assistance in accounting matters and the same need in matters of psychiatry. The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting. If the expert is later used as a witness on behalf of the defendant, obviously the cloak of privilege ends. But when, as here, the defendant does not call the expert the same privilege applies with respect to communications from the defendant as applies to such communications to the attorney himself.[13] The government urges that even if we recognize the existence of the privilege, there was in this case a waiver.

■■■ The first waiver contention is based upon the provision of the May 6, 1974 discovery order quoted above. The theory is that because prior to the retention of Dr. Sadoff it was clear that his report would be disclosed, there never was any expectation of privacy. Entirely apart from the question whether or not a waiver constructed on this chronology would suffice to meet federal waiver standards,[14] we do not think the order can be so construed. The government first opposed the defendant's discovery motion. This led to negotiations which produced a form of order to which the government was agreeable. The government was entitled to medical reports which the defendant intended to produce at the trial. Rule 16(c), Fed.R.Crim.P. The language of the order goes beyond this, requiring the production of all reports without reference to whether the defendant intended to produce them at the trial. But we do not construe it as a waiver of the attorney-client privilege. Rather we view it as a matter of convenience in trial preparation which enabled the government to prepare for cross-examination if the defendant decided to call any particular psychiatrist as a witness. Mr. Campion could, we think, properly assume that expert testimony could not be compelled. *See* Rule 28(a), Fed.R.Crim.P. We find no waiver of the attorney-client privilege.

■■■ But the government also contends for a much broader waiver rule. It urges that the assertion of an insanity defense results in the waiver of any claim of privilege with respect to any psychiatric examination of the defendant. The issue of a physician-patient privilege in this context of the trial of an insanity defense is not before us.[15] Such a privilege would arise only in the context of a consultation for diagnosis or treatment. We are dealing with consultation for trial preparation, and possibly for testimony. We must also distinguish the issue of waiver if either a treating physician or a trial consultant is called to the stand and testifies. *See* 8 J. Wigmore, Evidence § 2390, at 861–65 (McNaughton ed. 1961). The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity

---

**13.** The consultation with Dr. Sadoff was not for the purpose of diagnosis or treatment. Thus we are not dealing with a Psychotherapist-Patient Privilege such as was the subject of the proposed Rule 504 of the Proposed Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 240 (1973). That proposed rule, as well as all specific treatments of the subject of privilege, was eliminated by Congress in favor of the general statement in Rule 501. Act of Jan. 2, 1974, Pub.L.No. 93–595, 88 Stat. 1926, 1933–34.

**14.** *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

**15.** *See* note 13 *supra.*

make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

The government contends that in this case no harm resulted from Dr. Sadoff's testimony about damaging factual statements made to him by John Martinez, because the trial was bifurcated. But the broad waiver rule which it urges would be equally applicable to cases in which there was no bifurcation. Moreover, the inhibiting effect of a rule waiving the attorney-client privilege with respect to psychiatric consultations in all cases of an insanity defense operates not only with respect to the facts of the crime but also with respect to the defendant's mental state. The attorney should not be inhibited from consulting one or more experts, with possibly conflicting views, by the fear that in doing so he may be assisting the government in meeting its burden of proof on the *Currens* issue. Thus we reject the contention that the assertion of insanity at the time of the offense waives the attorney-client privilege with respect to psychiatric consultations made in preparation for trial.

■ Finally, as with Dr. Flicker's testimony, the government urges that if it was error to admit Dr. Sadoff's testimony the error was harmless. Dr. Trent, for the defense, testified to a number of damaging admissions by John Martinez with respect to the offense so that the jury could understand the basis for his opinion that Martinez was insane at the time of its commission. Dr. Sadoff repeated many of the same admissions. Were the issue solely whether John Martinez was a participant we could say admission of Dr. Sadoff's testimony was harmless. But the issue was his sanity, and Dr. Sadoff formed from much the same data a conclusion opposed to that of Dr. Trent. The error was not harmless.

■ The admission of Dr. Sadoff's testimony was error and requires a new trial. If the government at a new trial can produce evidence, other than the May 6, 1974 discovery order and his assertion of the insanity defense, that Martinez made disclosures to Sadoff with no expectation of confidentiality our present ruling does not preclude use of his testimony. There is no such evidence in this record.

## OBJECTIONS TO THE CHARGE

■ Relying principally on a line of cases in the District of Columbia Circuit [16] John Martinez requested instructions respecting the disposition in the event he was found not guilty by reason of insanity.[17] The thrust of the request-

16. *See Lyles v. United States,* 103 U.S.App. D.C. 22, 254 F.2d 725, 728–29 (1957) (Prettyman and Burger, JJ., concurring), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); *Taylor v. United States,* 95 U.S.App. D.C. 373, 222 F.2d 398, 404 (1955).

17. Requested charge # 9 read:
"If you find John Martinez not guilty by reason of insanity, that finding shall be brought to the attention of the appropriate officials of the State of New Jersey to the end that he may not remain in a position in which he may be a danger to himself or to the public." (App. for John Martinez, at 2a).
Requested charge # 10 read:
"If you find Jorge Martinez not guilty by reason of insanity he will be presumed to be insane and may be confined in a hospital for the insane as long as the public safety and his welfare require." (App. for John Martinez, at 5a).
Requested charge # 11 read:
"A verdict of not guilty by reason of insanity means that the accused will be confined in a hospital for the mentally ill until the superintendent has certified, and the

ed instructions was to inform the jury that it was likely that defendant would be subject to a civil commitment if the jury brought in such a verdict. The trial court refused to give any such instruction. In this respect it followed the preponderance of federal authorities.[18] This circuit has not considered the question. We conclude that the trial court properly refused to give any of the requested instructions. We do so primarily because they would, with respect to a federal defendant outside the District of Columbia, convey to the jury a misleading impression. In the District of Columbia the commitment provisions of 24 U.S.C. §§ 211, 212 and the commitment provisions of D.C.Code § 24-301 are available. *See Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1961). Elsewhere chapter 313 of title 18 applies. Section 4246 provides for commitment of the accused to the custody of the Attorney General or his authorized representative if he has been found mentally incompetent in accordance with the provi-

sions of § 4244 or § 4245; that is, mentally incompetent to stand trial. Section 4247 deals with prisoners who while serving a sentence become insane. But chapter 313 makes no provision for civil commitment of federal defendants found not guilty by reason of insanity.[19] This gap in the federal law has received the attention of the Judicial Conference and the Department of Justice over a long period, but Congress has not responded.[20] In part the reluctance of Congress to enact legislation beyond the situations dealt with in chapter 313 may reflect a doubt as to federal constitutional authority to commit persons not charged with or convicted of a federal offense. For whatever reason, if a federal defendant is found not guilty by reason of insanity he is simply released with the hope that State authorities may commence civil commitment proceedings. There is no assurance that the State will act. Federal jurors outside the District of Columbia should not be misled by an instruction suggesting otherwise.

court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or to others, in which event and at which time the court shall order his release either unconditionally or under such conditions as the court may see fit." (App. for John Martinez, at 6a).

18. *See United States v. McCracken,* 488 F.2d 406, 422 (5th Cir. 1974); *United States v. Borum,* 464 F.2d 896, 900–01 (10th Cir. 1972); *Apgar v. United States,* 440 F.2d 733, 737 (8th Cir. 1971); *White v. United States,* 387 F.2d 367 (5th Cir. 1967); *Pope v. United States,* 372 F.2d 710, 731–32 (8th Cir. 1967), *vacated on other grounds* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Powers v. United States,* 305 F.2d 157, 158 (10th Cir. 1962) *cert. denied,* 375 U.S. 858, 84 S.Ct. 123, 11 L.Ed.2d 85 (1963); *Pope v. United States,* 298 F.2d 507 (5th Cir. 1962), *cert. denied,* 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965); *see also United States v. Greene,* 497 F.2d 1068, 1975–76 (7th Cir. 1974).

19. Settle & Oppegard, The Pre-Trial Examination of Federal Defendants, reprinted in Oliver, Application of Psychiatry to Study, Observation, and Treatment of the Federal Offender, 35 F.R.D. 459, 475 (1964) (Appendix C):

"[I]t is essential to understand and keep in mind that no agency of the Federal Government has the authority to confine, nor does any Federal court (District of Columbia excepted) have the power to commit mentally ill persons involuntarily for care and treatment. The responsibility for the involuntary detention of the insane for treatment and the protection of society rests solely with the states. . . ."

20. *See United States v. Currens,* 290 F.2d 751, 775–76 (3d Cir. 1961):

"Courts of appeals have differed in their views as to available procedure in the event that a person is found not guilty of a federal criminal charge by reason of insanity. . . In any event, should Currens be acquitted at his new trial, the federal authorities should bring him and his condition to the attention of the State authorities to the end that he may not remain in a position in which he may be a danger to himself or to the public."

Among the many bills dealing with the problem that have been submitted to Congress are the following:

H.R. 3907, 94th Cong., 1st Sess. § 3613 (1975); H.R. 15046, 91st Cong., 1st Sess. §§ 4237–38 (1969); S. 979, 91st Cong., 1st Sess. § 4249 (1969); H.R. 17033, 89th Cong., 2d Sess. § 4249 (1966); S. 3689, 89th Cong., 2d Sess. § 4249 (1966).

## OTHER CLAIMED ERRORS

█ John Martinez claims that the government attorney went beyond the bounds of proper argument in summation. Where there were improprieties they were promptly and vigorously dealt with by the district court. We find no error in these rulings.

## SCOPE OF THE REMAND

We mentioned earlier that the district court bifurcated the trial between issues of the defendants' participation and the issue of John Martinez's sanity.[21] There was a determination by the jury that he was a participant. Both of the errors upon which we base reversal occurred in connection with the trial of the sanity issue and could not have affected the jury's determination that John Martinez participated in the kidnapping. We must, therefore, determine whether the mandate should provide for a new trial of the entire case or only on the sanity issue.

█ It is by now a settled proposition that the double jeopardy clause of the fifth amendment does not bar a retrial after a reversal on appeal[22] so long as there was sufficient evidence presented in the first trial to establish a *prima facie* case.[23] Moreover we have statutory authority to "require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. In civil cases it is not at all unusual, even in jury cases, to remand for a new trial on some but not all the issues, damages for example.[24] The civil cases stand for the proposition that the seventh amendment jury trial guarantee does not require that the entire case be tried before the same jury. In no deci-

sion that we have found, however, has a federal appellate court ordered a new trial in a criminal case on some but not all of the issues upon which the government had the burden of proof beyond a reasonable doubt.

There is no extensive federal jurisprudence on bifurcating verdicts, although this circuit and others have dealt tangentially with the subject. In *United States ex rel. Scoleri v. Banmiller,* 310 F.2d 720 (3d Cir. 1962) (*en banc*), *cert. denied,* 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963), this court considered Pennsylvania's former practice of allowing the same jury to decide both guilt and sentence in a capital case. In a sharply divided *en banc* decision, the court held that due process was violated when prejudicial evidence was admitted bearing on sentence prior to guilt determination. Bifurcation, it was held, was required by due process. *See Frady v. United States,* 121 U.S.App.D.C. 78, 348 F.2d 84 (1965), *cert. denied,* 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965). *Compare United States v. Curry,* 358 F.2d 904 (2d Cir.), *cert. denied,* 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966). The holding in *Banmiller, supra,* was overruled by *Spencer v. Texas,* 385 U.S. 554, 559 n.5, 567–69, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). *See McGautha v. California,* 402 U.S. 183, 209–10, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).

█ Analytically, bifurcation between the verdict on guilt and the imposition of sentence is a quite distinct issue. Sentence is not a matter on which the government has the burden of proof beyond a reasonable doubt. On guilt it has that burden, and in this circuit guilt includes capacity. *Government of the*

---

21. Statements he made to the psychiatrist tended to implicate codefendants. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Verdict bifurcation was an alternative to severance.

22. *See, e. g., Forman v. United States,* 361 U.S. 416, 425–26, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960).

23. *See Sapir v. United States,* 348 U.S. 373, 373–74, 75 S.Ct. 422, 99 L.Ed. 426 (1955) (Douglas, J. concurring).

24. *See, e. g., Haddigan v. Harkins,* 441 F.2d 844, 853 (3d Cir. 1970) (*en banc*); *Russell v. City of Wildwood,* 428 F.2d 1176, 1183 (3d Cir. 1970).

*Virgin Islands v. Bellott, supra.* In *Holmes v. United States,* 124 U.S.App. D.C. 152, 363 F.2d 281 (1966), Judge Bazelon, in a § 2255 application, rejected a claim that the petitioner had been inadequately represented by counsel who failed both to interpose the insanity defense and to request a bifurcated verdict on participation and competency. All this grew out of the attorney's refusal to put a psychiatrist on the stand because he felt the testimony would prejudice the issue of guilty participation. While rejecting § 2255 relief on the record before it, the court said that the district court had inherent power to control the order of criminal trial so as to avoid prejudice.[25] The *Holmes* opinion speaks only of controlling the order of a criminal trial, not of trying the issue of participation and the issue of guilt to separate juries.

In the state courts, as might be expected, there has been more extensive experience with bifurcated verdicts. In California, for example, a statute first enacted in 1927 requires that the issue of guilt and the defense of insanity be tried separately.[26] When a jury finds a defendant guilty but disagrees on insanity California goes so far as to permit the impanelling of a second jury to try or retry the insanity issue alone.[27] The effect of the California mandatory bifurcation is to deprive the defendant of the benefit of evidence bearing upon wilfulness or premeditation. In *People v. Wells,* 33 Cal.2d 330, 202 P.2d 53, *cert. denied,* 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510 (1949), despite the apparently mandatory language of the California statute, that state's Supreme Court held it was error to refuse to admit evidence at the guilt determining stage, that a psychological abnormality could have produced a belief by the defendant that he was acting in self defense when he committed an assault. The difficulties presented by the California procedure are analyzed in Louisell and Hazard, *Insanity as a Defense: The Bifurcated Trial,* 49 Cal.L.Rev. 805 (1961).[28] Both the California cases discussed and the law review article antedated the decision in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) which imposed a federal jury trial requirement

**25.** "Although trial counsel's appraisal of the prejudicial effect of the insanity defense on the defense of not guilty was entirely reasonable, it does not follow that the insanity defense had to be abandoned. He could have made a motion, like that made by able counsel in another case recently before us, that the District Court avoid the prejudice by exercising its discretion to first submit to the jury issues raised by the not guilty plea before the introduction of evidence on insanity. The power of courts to control the order of criminal trial and submission of issues to the jury has its roots in the common law, and is in no way inconsistent with the Federal Rules of Criminal Procedure. *Cf. United States v. Curry,* 358 F.2d 904 (2d Cir. 1966). Federal Courts in civil cases are specifically authorized to order the separate trial of any issue 'to avoid prejudice.' Rule 42(b), Fed.R.Civ.P. The need to avoid prejudice in criminal trials is even greater." 363 F.2d at 282–83 (footnotes omitted).

**26.** Cal.Penal Code § 1026 (West Supp.1975) reads in pertinent part:

"When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court. . . . "

**27.** *See People v. Eggers,* 30 Cal.2d 676, 185 P.2d 1 (1947), *cert. denied,* 333 U.S. 858, 68 S.Ct. 728, 92 L.Ed. 1138 (1948); *People v. Farolan,* 214 Cal. 396, 5 P.2d 893 (1931); *People v. Messerly,* 46 Cal.App.2d 78, 116 P.2d 781 (Dist.Ct.App.1942).

**28.** A short case note dealing with some of the constitutional problems presented by the California statute is found in 15 S.Cal.L.Rev. 255 (1942).

upon the states. No post-*Duncan* California case appears to have considered the application of federal standards to § 1026 although we note that the California legislature reenacted that section in 1974 with minor changes not pertinent to the due process questions we are considering.

Another state with a statute similar to that of California is Arizona. In *State v. Shaw,* 106 Ariz. 103, 471 P.2d 715 (1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971), the Supreme Court of Arizona held that the statute violated due process under the state constitution and under the fourteenth amendment because it excluded from the guilt determining process consideration of evidence bearing upon intent, premeditation, or malice. *See* Comment, *Due Process and Bifurcated Trials: A Double-Edged Sword,* 66 Nw. U.L.Rev. 327 (1971), discussing due process problems presented by the several varieties of state bifurcation statutes, and suggesting that there is a legislative movement away from the device.

█ The due process defect upon which the Arizona Supreme Court relied is not so acute when the same jury determines both the fact of participation and the mental capacity of the accused, although participation and competency are considered sequentially. But in the remand situation that will not be possible. A remand for the single purpose of determining sanity will present the due process defect in its most acute form. It is a problem which involves not only an interpretation of 28 U.S.C. § 2106, but also the interaction of the fifth amendment due process and double jeopardy clauses and the jury trial guarantees of article III, § 2, cl. 3 and the sixth amendment. In view of the high place

the Supreme Court has given the institution of jury trial in criminal prosecutions,[29] we do not believe that the civil cases granting new trials on limited issues can be regarded as dispositive. The safeguard of a single jury passing upon the entire government case in a criminal trial is a significant one. Where, as in this case, the government must prove beyond a reasonable doubt a number of elements, it is entirely possible that some jurors might be in reasonable doubt on some elements while other jurors, convinced on those elements, entertained reasonable doubts on others. We need not now hold that the constitution requires a unitary jury trial before a single jury on the entire case. We hold that it is "just under the circumstances," *see* 28 U.S.C. § 2106, that when a new trial is ordered in a criminal case in which there have been bifurcated jury determinations, there shall be a new trial on the whole case.[30]

The judgment appealed from will be reversed and the case remanded to the district court for a new trial.

JAMES HUNTER, III, Circuit Judge (concurring):

I concur fully in the opinion of the court, but would like to add a few words. With respect to Dr. Flicker's testimony, what is determinative in my view is the fact that the order appointing Dr. Flicker was a single purpose order. While § 4244 has an explicit prohibition only with respect to *statements* of the accused,[1] I believe that a prohibition on *opinion* testimony as to insanity within the meaning of *Currens* can be implied where the order is a single purpose one. Such an implicit prohibition arises from the fact that the sole purpose of the examination was to determine com-

---

**29.** *See, e. g., Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

**30.** We do not mean to suggest that any constitutional problems are presented ordinarily when we remand for retrial one or more counts of a multicount indictment.

**1.** That prohibition would be operative even if the order were a dual purpose one. See *United States v. Malcolm,* 475 F.2d 420, 426–27 (9th Cir. 1973).

**1052**

petency to stand trial, and that defense counsel's consent to such an order may be a result of his understanding of its limited purpose.[2] Had the district court appointed Dr. Flicker to determine sanity at the time of the offense as well as competency to stand trial, we would be faced with a substantially different case.[3]

I also agree fully with the court's opinion that, with respect to Dr. Sadoff's testimony, the May 6 discovery order neither constituted a waiver of the attorney-client privilege nor destroyed the necessary expectation of confidentiality on the part of Martinez. In order for there to be an absence of an expectation of confidentiality which would prevent the attorney-client privilege from coming into being, there must be evidence that the person who made the communication and who is attempting to invoke the privilege was *personally* aware that his communications would be made known to other parties. There is no evidence that Martinez was personally aware that the Government would be able to learn of his communications to Dr. Sadoff, and a discovery order of which only counsel is aware is insufficient to establish the required personal knowledge on the part of the individual claiming the privilege.[4] As the court today holds, the admissibility of Dr. Sadoff's testimony at retrial is dependent upon whether the Government can produce some other evidence that Martinez made disclosures to Dr. Sadoff without an expectation of confidentiality.

---

2. See *United States v. Driscoll*, 399 F.2d 135, 137 (2d Cir. 1968), where the court stated: "We do not believe that a defendant can be told that he is to be examined for one purpose and, once his cooperation has been obtained, be advised of another." See also *Winn v. United States*, 106 U.S.App.D.C. 133, 270 F.2d 326, 327–28 (1959). Furthermore, I agree with the dicta in the majority opinion that the use of statements and the fruits thereof elicited in a *compelled* psychiatric examination to establish sanity under *Currens* would present serious fifth amendment problems, although I note authorities indicating that the fifth amendment privilege may be deemed waived under some circumstances. See, *e. g.*, *United States v. Malcolm, supra*, 475 F.2d at 425.

3. The majority of circuits have permitted opinion testimony following a dual purpose order. *Compare United States v. Malcolm, supra,* and *United States v. McCracken*, 488 F.2d 406 (5th Cir. 1974), with *United States v. Driscoll, supra.*

4. In *United States v. Tellier*, 255 F.2d 441 (2d Cir.), *cert. denied*, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958), on which the Government relies, it was quite clear from the record that the party claiming the privilege expected the substance of the communication to be passed on to others.