**In re G–I HOLDINGS INC., et al., Debtors.**

**No. CIV.02–03082(WGB).**

United States District Court, D. New Jersey.

July 17, 2003.

**430**

Christopher J. Christie, United States Attorney, Susan Steele, Assistant U.S. Attorney, Richard G. Jacobus, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for the United States.

Alburt H. Turkus, Bryon A. Christensen, Skadden, Arps, Slate, Meagher & Flom LLP, William F. Nelson, J. Bradford Anwyll, Sanford W. Stark, Jonathan Z. Ackerman, McKee Nelson LLP, Washington, D.C., Dennis O'Grady, Mark Hall, Riker, Danzig, Scherer Hyland & Peretti, Morristown, NJ, for Debtors.

*OPINION*

BASSLER, District Judge.

G–I Holdings and Debtors move to bifurcate discovery and trial on the issue of penalties pending resolution of the substantive tax issues relevant to Debtors' 1990 and 1999 Transactions with Rhone–Poulenc Surfactants and Specialties, L.P. The U.S. Department of Justice, Tax Division, opposes this motion and moves to compel debtors to respond to discovery requests and for enlargement of the discovery schedule. The Court heard oral argument on June 5, 2003.

*I. BACKGROUND*

The United States contends that the 1990 transfer of property by GAF Chemicals Corporation (predecessor to G–I Holdings Inc.) and Alkaril Chemicals Inc. (predecessor to ACI) (collectively, "Debtors") to Rhone–Poulenc Surfactants and Specialties, L.P. ("RPSSLP") (as a whole, the "1990 Transaction"), failed to qualify as a nontaxable contribution to the capital of RPSSLP under 26 U.S.C. § 721(a). Rather, the Government claims, the 1990 Transaction was a taxable disguised sale of property by Debtors to either RPSSLP or Rhone–Poulenc Inc. and/or its affiliates under 26 U.S.C. § 707(a). Alternately, the Government claims that Debtors recognized taxable gain as a result of the 1990 Transaction because RPSSLP was not a partnership for federal income tax purposes or, if RPSSLP was a partnership, Debtors were not a partner in RPSSLP.

Pursuant to 11 U.S.C. § 505(a), the Commissioner of Internal Revenue Service filed with the United States Bankruptcy Court for the District of New Jersey timely Proofs of Claim against G–I and ACI for unpaid income tax liabilities. On September 21, 2001, The Commissioner filed a Proof of Claim against G–I Holdings for $400,698,443.88. On January 29, 2002, the Commissioner filed a Proof of Claim against ACI for $530,612,540.13. The Commissioner also asserted penalties against ACI in the amount of $49,387,544.

Denying the claims, Debtors contend that under 26 U.S.C. § 721(a), the 1990 transfer constituted a non-taxable contribution to the capital of RPSSLP. On May 7, 2002, Debtors filed their Objection to the IRS claims, raising substantive federal income tax issues. The IRS then moved for mandatory withdrawal of the reference to the Bankruptcy Court of Debtors' Objection.

Pursuant to 28 U.S.C. § 157(d), this Court granted the Government's motion and withdrew the reference of the Debtors' Objection, finding that the resolution of claims would require substantial and material consideration of non-bankruptcy Code statutes. *In re G–I Holdings Inc.*, 295 B.R. 222, 223–24 (D.N.J.2003). As a result, this Court now has jurisdiction over this matter.

*II. DISCUSSION*

A. *Debtors Have Waived Any Attorney-Client Privilege And Suffer No Prejudice Or Inefficiency Warranting Bifurcation.*

Federal Rule of Civil Procedure 42(b) allows the Court to order a separate trial of any claim or issue "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and

economy." Fed.R.Civ.P. 42(b). Only one of these criteria needs to be met for the Court to order a separate trial. *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1166 (7th Cir.1983) (quoting *U.S. v. IBM Corp.*, 60 F.R.D. 654 (S.D.N.Y.1973)).

Debtors seek to avoid the "prejudice" of premature waiver of the attorney-client privilege. They argue that in defending against the Government's penalty claims, they might assert a "reasonable cause" affirmative defense. (Memorandum in Support of Debtors' Motion to Bifurcate at 4, 10.) The affirmative defense provides that no penalty shall be imposed with respect to any portion of underpayment if the taxpayer acted in good faith and there was reasonable cause for such underpayment. 26 U.S.C. § 6664(c)(1) (2003). A taxpayer can demonstrate "reasonable cause" by showing that the taxpayer reasonably relied on professional advice. 26 C.F.R. § 1.6664–4(b) (2003).

Debtors ask the Court to bifurcate this litigation into substantive tax and penalty phases so that they can delay disclosure of confidential communications with their legal counsel until a penalty phase. Debtors argue that they could then limit their waiver of the attorney-client privilege to the penalty phase only and protect their privileged communications in a substantive tax phase.

Traditionally, district courts have broad discretion in reaching decisions on whether to separate the issues of liability and damages, so the Court could grant bifurcation. *Idzojtic v. Pennsylvania R. Co.*, 456 F.2d 1228, 1230 (3d Cir.1972) (citing 9 Wright & Miller, *Federal Practice and Procedure* § 2392); *See Lis v. Robert Packer Hospital*, 579 F.2d 819, 824 (3d Cir.1978) ("The rule in this circuit since 1972 has been that the decision to bifurcate Vel non is a matter to be decided on a case by case basis and must be subject to an informed decision by the trial judge in each instance.").

■ At issue is whether bifurcation would accomplish Debtors' goal of limiting the effects of their waiver of the attorney-client privilege. Generally, "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party..." Fed.R.Civ.P. 26(b)(1). The fundamental purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients." *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)); *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) (privilege is "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure.")

■ The attorney-client privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Rhone–Poulenc Rorer Inc. v. Home Indem.*, 32 F.3d 851, 862 (3d Cir.1994); *See, e.g., In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir.1979).

■ Normally, the attorney-client privilege shields access to the substance of attorney-client communications. Information such as representation itself or the date upon which services are rendered are freely discoverable. *See In re Semel*, 411 F.2d 195 (3d Cir.1969).

■ When a party cites legal representation as an affirmative defense to a claim, however, the party puts that advice "at issue" and waives the attorney-client privilege. The court in *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975), articulated a three part

test for finding "at issue" waiver: "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party information vital to his defense."

The Third Circuit, in *Rhone–Poulenc*, explained the rationale behind finding a waiver when a client uses a reliance-on-counsel defense:

> Courts have found that by placing the advice in issue, the client has opened to examination facts relating to that advice...The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing the attorney client communication.

32 F.3d at 863.

Recently, the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir.1995), found that a party waived its privilege when it asserted reliance on the advice of counsel regarding which parties should be included in a buy-back transaction. The court there rationalized that the party defending against a "reliance-on-counsel" claim must be able to test what information was conveyed by the client, whether counsel was provided with all material facts in rendering advice, and whether that advice was heeded by the client.

■ Once a party places attorney-client communications at issue, that party waives the privilege with regard to all communications on the same subject matter. Wigmore writes:

> The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter.

8 J. Wigmore, *Evidence* § 2328 at 638 (McNaughton rev.ed.1961).

Furthermore, courts have been vigilant in preventing litigants from converting the privilege into a tool for selective disclosure:

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality has already been compromised for his own benefit. The attorney-client privilege is not designed for such tactical employment.

Case Comment, *Stuffing The Rabbit Back Into the Hat: Limited Waiver of the Attorney–Client Privilege In An Administrative Agency*, 130 U. Pa. L.Rev. 1198, 1226 (1982).

In *Glenmede*, the court found that Glenmede's waiver encompassed all communications, both written and oral, to or from counsel as to the entire transaction involving the corporation's repurchase of stock from a charitable trust. 56 F.3d at 487. Similarly, in *In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982), the court found that when a company agreed to cooperate with the SEC by submitting an investigative report, it could not then refuse to submit underlying documents upon which that report was based, even though a privilege might otherwise have attached to those documents.

■ Once a party waives the attorney-client privilege, it relinquishes the privilege for all purposes and circumstances thereafter. *United States v. Krasnov*, 143 F.Supp. 184, 191 (E.D.Pa.1956) (citing *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951)) ("The privilege once waived cannot be regained"); *See United States v. Kelsey–Hayes Wheel Co.*, 15 F.R.D. 461, 464 (E.D.Mich.1954) ("If the client waives the privilege at a first trial, he may not claim it at a subsequent trial, because after the first publication the communication is no longer confidential and there is no reason for recognizing the privilege.").

■ Debtors argue that they are currently in a position to decide whether to waive their attorney-client privilege. The Court finds, however, that Debtors have already waived the attorney-client privilege with respect to the 1990 Transaction and Subsequent Events. The "reasonable cause" affirmative defense, set forth in Debtors' Response to Government Interrogatory No. 3 of the Gov-

ernment's First Set of Interrogatories, amounts to a "reliance on counsel" defense.

Interrogatory No. 3 requests:

State whether you contend that you are not liable for the Accuracy–Related Penalties, or any portion thereof, because your treatment of the 1990 Transaction and Subsequent Events on your 1990 through 1999 federal income tax returns did not constitute "negligence or disregard of rules or regulations" within the meaning of 26 U.S.C. § 6662(b)(1) and (c). If so, state the basis for that contention...including communications with tax and/or legal advisors, to ensure that your treatment of the 1990 Transaction and Subsequent Events...

(Interrogatory No. 3 of United States' First Set of Interrogatories.)

The Interrogatory asks whether Debtors claim they are not liable for the Accuracy–Related Penalties and reference the statutes. In doing so, the interrogatory aims to determine Debtors' defenses to the Government's penalty claims.

Debtors defend themselves with the precise phrasing of a "reasonable cause" exception. They state:

Debtors nonetheless are not liable for Accuracy–Related Penalties because they had a reasonable basis for the tax treatment of the transaction at issue and also had reasonable cause for any underpayment of tax and acted in good faith with respect to any such underpayment in this case.

(Debtors' Response to United States First Set of Interrogatories, Response to Interrogatory No. 3).

Debtors explicitly use the words "reasonable basis," "reasonable cause," and "good faith," all of which appear in § 6664 as descriptions of ways of finding reasonable cause[1].

Debtors further explain their basis for "reasonable cause" when they argue:

The lack of negligence or disregard of the internal revenue laws is evident by the

substantial authority supporting the Debtors' treatment of the transactions at issue...*The Debtors also consulted with outside legal counsel and other advisers regarding the tax treatment of the 1990 Transaction and Subsequent Events.*

(*Id.*) (Emphasis added.)

Debtors' Response meets the three-part *Hearn* test for "at issue" waiver. 68 F.R.D. at 581. First, the party now asserting the privilege took an affirmative act by raising a "reliance on counsel" defense. Second, through the affirmative act, the party asserting the privilege put the protected information at issue by making it relevant to the penalty issue in this case. Third, the application of the privilege would deny the party seeking discovery, the Government, access to information vital to the prosecution of its claim.

Debtors aim to protect themselves from waiver in General Objection No. 1, where they object to all of the interrogatories to the extent that they seek information subject "to the attorney-client privilege, attorney work product doctrine, or any other applicable privilege." (Debtors' Response to Government Interrogatories at 2.) Debtors, however, destroyed any previously asserted privilege by voluntarily placing the advice of their counsel at issue. *See D'Ippolito v. Cities Service Co.,* 39 F.R.D. 610 (S.D.N.Y.1965) ("Any privilege that may have attached was destroyed by the voluntary act of disclosure.") Had Debtors sought to preserve the attorney-client privilege, they should have refrained from raising the advice of counsel altogether.

 Debtors have already permanently waived their right to assert the attorney-client privilege and their waiver extends to the subject matter about which they responded; namely, the "tax treatment of the 1990 Transaction and Subsequent Events." (Debtors' Response to United States' Interrogatory No. 3.) Debtors' "prejudice" argument therefore fails as a reason to bifurcate.

---

1. 26 C.F.R. § 1.6664–4 entitled "Reasonable cause and good faith exception to section 6662 penalties" provides, "(b) ...Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith, if, under all circumstances, such reliance was reasonable and the taxpayer acted in good faith."

Debtors argue that the Court could bifurcate this litigation on efficiency grounds, as permitted by Rule 42(b). They claim that the penalties issue will not ripen unless the Government first prevails on the substantive tax claims and that the Court could truncate discovery by excluding potentially unnecessary discovery of penalty issues. (Mem. in Supp. of Debtors' Motion to Bifurcate at 7.)

■ Debtors' efficiency arguments fails because of this Court's finding that Debtors have already waived the attorney-client privilege with regard to the 1990 Transaction and Subsequent Events. Contrary to Debtors' arguments, the subject matter waiver applies to the entire 1990 Transaction and Subsequent Events and is not limited to the issue of penalties. Even though Debtors waived in response to a penalty-related Interrogatory, established authority supports waiver for the subject matter addressed:

> Since there is now subject matter waiver allowing the Government to access relevant communications for tax and penalty phases of litigation, there is no need to bifurcate the trial to limit the waiver to the penalty phase. It is also in the best interest of the Court and the parties to maintain a single discovery phase so that discoverable information with regard to the 1990 Transaction and Subsequent Events need only be produced once. A single trial would lessen the delay, expense, and inconvenience to all parties.

The Court therefore denies Debtors' request to bifurcate.

### B. Debtors' Communications with Michael Baldasaro Do Not Satisfy Kovel And Are Discoverable.

The Government seeks production of documents on GAF"s Privilege Log numbered 56, 61, 64, 70, 72, 177, 191, 238, 262, 268, 269, 270, 284, 294, 351, 361, 370, and 371. Debtors' in-house counsel sent these documents to Michael Baldasaro, an accountant and, at the time, an employee of Arthur Andersen. The Government contends that such documents are not privileged because Baldasaro is an accountant and therefore not covered by the attorney-client privilege. Thus, the Government argues, when Debtors sent the withheld documents to Baldasaro, Debtors exposed otherwise privileged documents to a third-party, permanently waiving the attorney-client privilege. Debtors, on the other hand, argue that such documents are privileged because Baldasaro satisfies the requirements of *U.S. v. Kovel*, 296 F.2d 918 (2d Cir.1961), which extends the attorney-client privilege to accountants.

In 1998, Congress established a limited privilege for accountant-client communications. Pub.L. No. 105–206, title III, § 3411, 112 Stat. 685, 751 (codified at 26 U.S.C. § 7525 (Supp. V 1999)). The privilege, however, applies only to communications occurring after July 22, 1998. *Id.* Neither party argues that the statutory provision applies here, as the transactions at issue occurred before this date. *Cavallaro v. United States*, 284 F.3d 236, 246 (1st Cir.2002).

*U.S. v. Kovel* is the basis of Debtors' accountant-client privilege argument. There, the court compared menial or ministerial assistants of attorneys, such as secretaries, file clerks, and messengers, to accountants who aid in the administration of legal advice. *Kovel*, 296 F.2d at 921.

The *Kovel* court's limited extension of the attorney-client privilege is evident by its vision of the purpose for which the accountant would assist an attorney. It stated:

> ...The attorney, ignorant of the foreign language, sends the client to a non-lawyer proficient in it, with instructions to interview the client on the attorney's behalf and then render his own summary of the situation, perhaps drawing on his own knowledge in the process, so that the attorney can give the client proper legal advice."

*Id.*

■ The *Kovel* court thus carefully limited the attorney-client privilege between an accountant and a client to when the accountant functions as a "translator" between the client and the attorney. It stated, "Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege..." *Id.*

Rather, the court emphasized, what is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. *Id.*

Contrary to Debtors' argument, *U.S. v. Alvarez*, 519 F.2d 1036 (3d Cir.1975), expounds on *Kovel* but adheres closely to the "translator" analogy. In *Alvarez*, the court recognized an attorney-client privilege between a criminal defendant and a psychiatrist hired by defense counsel in preparation for trial. In that case, the district court authorized retention of a physician for the preparation of an insanity defense. The physician examined the defendant and reported on the defendant's state of mind, depression, and capacity to conform his conduct to the requirements of the law. *Id.* at 1045. The physician then prepared the report and addressed it to defense counsel. *Id.*

The *Alvarez* court's rationale for finding an attorney-client privilege mirrors that used by the *Kovel* court. The *Alvarez* court stated, "The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting." *Id.* at 1046. Both courts thus required that for a court to find a privilege, third parties must act as "go betweens" to assist the communication between a client and an attorney.

Therefore, Debtors are overbroad in arguing that *Alvarez* expands *Kovel* to protect all third party communication necessary to assist the lawyer in rendering legal service to the client. (Debtors' Mem. in Opp. to United States' Motion to Compel at 15.) Debtors' error stems from their reliance on a loosely phrased sentence from *Alvarez* describing *Kovel*. The actual holdings of the cases rather than isolated sentences reveal that *Alvarez* and *Kovel* are nearly identical. Debtors thus fail in their attempt to cloak Baldasaro's communications with an attorney-client privilege based on the contention that it was "necessary in order to provide legal advice and counsel to the senior management of GAF." (*Id.*)

In fact, *U.S. v. Ackert*, 169 F.3d 136 (2d Cir.1999), explicitly rejects findings of an attorney-client privilege based on the necessity or value of the provided assistance. In *Ackert*, tax counsel to Paramount Corporation sought the advice of investment banker David Ackert of Goldman Sachs. Tax counsel initiated the discussions to "learn more about the details of the proposed transaction and its potential tax consequences so that he could advise his client, Paramount, about the legal and financial implications of the transaction." *Id.* at 138.

The court found that the attorney-client privilege did not protect against disclosure of communications between tax counsel and Ackert: "Because Ackert's role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with [tax counsel]." *Id.* at 139–140.

The record here is sparse. The only document describing communications between Debtors and Baldasaro is the four-page Declaration of Alvin M. Yanofsky, an in-house attorney for GAF who worked with Baldasaro. Neither Debtors nor the Government direct the Court to other documents in the record indicating the nature of Baldasaro's work.

Paragraph 8 of Yanofsky's Declaration supports a finding that GAF hired Baldasaro as a tax consultant, not a translator. Yanofsky writes:

> Mr. Baldasaro assisted us in understanding the tax and tax accounting ramifications of the proposed structure, which assistance was necessary in order for us to provide legal advice and counsel to the senior management of GAF.

(Yanofsky Decl. at ¶ 8.)

Here, Yanofsky explains that GAF's attorneys hired Baldasaro to explain tax concepts to in-house counsel so that in-house counsel could then render legal advice to GAF's senior management. GAF's attorneys merely sought Baldasaro's expertise, which they could then use on their own. Since GAF's in-house counsel appears to have hired Baldasaro for his tax advice alone, Baldasaro's communications with GAF fall outside *Kovel's* limited extension of the attorney-client privilege. Baldasaro's role in this case mirrors that of Ackert in *U.S. v. Ackert*,

169 F.3d 136, because he remained above the fray, merely providing advice to counsel.

In fact, Yanfosky admits, in paragraph 9, that GAF hired Baldasaro as a consultant. In explaining why Debtors cannot provide the Court with bills or retainer agreements indicating Baldasaro's retention as a facilitator, as opposed to that as a consultant for which GAF hired him and his employer, Arthur Andersen[2], Yanofsky states:

> I have not been able to locate Mr. Baldasaro's billing statements from the 1989 through 1990 timeframe; however, to the best of my recollection AA billed us separately for Mr. Baldasaro's *consulting work on the 1990 Transaction.*

(Yanofsky Decl. at ¶ 9.) (Emphasis Added.)

In addition, aspects of the record, other than Yanofsky's Declaration, suggest that Baldasaro was a consultant, not a translator or facilitator. Debtors' privilege log reflects no documents sent *from* Baldasaro to Debtors' in-house counsel or to the client that would indicate the centrality of Baldasaro's role as a facilitator. For example S. Block, Senior Vice President and General Counsel of GAF authored Documents 56, 61, 64, 70, 177, 262, 269, 284, 351, 361, 370, 371; B. Kapell, Vice President of the Tax Department of GAF authored Documents 72 and 294; S. Hallmark, an attorney at King & Spalding, authored documents 191, 238, 268, 270. These documents demonstrate that neither GAF nor GAF's attorneys needed Baldasaro to facilitate communications between them. They could communicate competently on their own.

GAF's privilege log lists Baldasaro as a recipient or a copied recipient on memos that other attorneys or GAF employees sent. His inclusion on recipient lists of memos does not cloak Baldasaro with the attorney-client privilege. Otherwise routine, nonprivileged communications between corporate officers or employees transacting general business of a company do not attain privileged status solely because in-house or outside counsel is "copied in" on correspondence or memoranda. Only if the express purpose of the communication was to relay information for the purpose of seeking legal advice, does the privilege attach. *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 174 F.R.D. 609, 636 (M.D.Pa.1997).

Baldasaro's high level of expertise strongly suggests that he did not facilitate communications regarding the 1990 Transaction. Baldasaro was an expert in "tax accounting *implications* of complex transactions, including an expertise in partnership transactions." (Yanfosky Decl. at ¶ 7.) (Emphasis added.) The term "implications" implies that GAF's in-house counsel hired Baldasaro to inform them of the consequences of proposed aspects of the transaction. There is no evidence that GAF hired Baldasaro to sit with GAF employees and define tax concepts to attorneys unschooled in tax and accounting, or vice versa. If GAF hired Baldasaro for Baldasaro's expertise, then GAF sought Baldasaro's independent tax advice, not his help as a translator defining complicated accounting concepts. Communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the ability to represent the client. *United States v. Ackert,* 169 F.3d at 139.

It is true that corporate employees working on complicated transactions often require the assistance of consultants or tax advisors. Such consultants or tax advisors who do not interact with clients, however, are not protected by an attorney-client privilege. As noted, what is vital to the privilege is that the client's communication be made in confidence for the purpose of obtaining legal advice from the lawyer. *Kovel,* 296 F.2d at 922.

GAF's employment of Baldasaro thus falls outside of the *Kovel* doctrine and Debtors' communications with Baldasaro are not privileged. Debtors must produce to the Govern-

---

2. The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements. The absence of contemporaneous documentary proof, such as a separate retainer agreement or individualized billing statements, strongly supports the Government's argument that Baldasaro performed the same consulting services for GAF as did other Arthur Andersen employees. *See U.S. v. Adlman,* 68 F.3d 1495 (2d Cir.1995); *See also Cavallaro v. United States,* 284 F.3d 236 (1st Cir.2002).

ment the aforementioned documents and any other documents to which Baldasaro had access. Moreover, all communication between the Debtors and Baldasaro are discoverable due to subject matter waiver, as previously discussed.

### C. All Communications Between Debtors and McKee and Nelson Are Discoverable Due to Subject Matter Waiver.

██ At the February 6, 2003 status hearing and by letter dated March 10, 2003, Government counsel indicated their interest in deposing William S. McKee and William F. Nelson. (Notice of Debtors' Motion to Bifurcate at 6.) The Court finds that since McKee and Nelson worked on the 1990 Transaction, and Debtors have now waived all attorney-client privilege with regard to that subject matter, Debtors must produce relevant communications between them and McKee and Nelson.

In 1989, GAF Chemicals Corp. hired McKee and Nelson, then partners in the law firm of King and Spalding, LLP. (Exhibit B to United States' Response to Debtors' Motion to Bifurcate at ¶ 11(a).) McKee and Nelson both stated in 1993 depositions in the matter of *Rhone–Poulenc v. GAF*, Civ. No. 12848 (Del. Ch.1993), that they served GAF as counsel. In his 1993 deposition, McKee stated, "GAF is a client of our firm." (McKee Deposition, March 30, 1993 at 4.) In Nelson's 1993 deposition, Robert Charles of Proskauer, Rose Goetz & Mendelsohn stated, "And the attorney who sits beside me here, Mr. Nelson, also represents GAF." (Nelson Deposition, March 30, 1993 at 5.)

Furthermore, in their Supplemental Affidavit and Disclosure Statement, Debtors state that McKee and Nelson "participated in the tax planning relating to the 1990 Transaction and in the drafting of an opinion letter, dated April 30, 1990, from King & Spalding to GAF Chemicals regarding the federal income tax consequences of the 1990 Transaction... [and] the drafting of the opinion letter, dated April 30, 1990, from King & Spalding to GAF Chemicals regarding the federal income tax consequences of the 1990 Transaction." (Exhibit B to United States' Response to Debtors' Motion to Bifurcate Discovery at ¶ 11(a).)

Debtors thus acknowledge that McKee and Nelson worked on the 1990 Transaction as counsel. Due to Debtors' subject matter waiver, Debtors' communications with McKee and Nelson on that matter are discoverable. The Government may depose McKee and Nelson.

Debtors argue that Nelson's involvement in this case as an attorney and as a potential material witness in the same proceeding creates a conflict of interest.

In his Affidavit and Statement, prepared in support of an application for an order pursuant to 11 U.S.C. § 327(E) and 328(A) approving his employment as special tax counsel for G–I Holdings, Nelson notes, "I have represented, and am currently representing, the Debtor in connection with litigation before the United States Tax Court...and the U.S. Court of Appeals for the Third Circuit [3]." (Exhibit C to United States' Response to Debtors' Motion to Bifurcate.)

The Court agrees with the Government that Debtors "created the very prejudice of which they complain." (United States' Response to Debtors' Motion to Bifurcate at 15.) As demonstrated by the discovery materials already produced, Debtors are aware of Nelson's involvement in the drafting of the RPSSLP partnership agreement and the drafting of an April 30, 1990 opinion letter regarding the federal income tax consequences of the 1990 Transaction. Nevertheless, they continue to employ him as an attorney in this case, where the 1990 Transaction is at issue.

---

**3.** The Third Circuit case was a pending interlocutory appeal of an order entered by the Tax Court denying Debtors' motion for summary judgment. The Third Circuit dismissed this appeal as lacking a case or controversy under Article III of the Constitution, dismissed the leave to appeal as having been improvidently granted, and remanded to the Tax Court for further proceedings on the merits. *Rhone–Poulenc Surfactants and Specialties, L.P. v. Commissioner of Internal Revenue*, 249 F.3d 175 (3d Cir.2001). Debtors then filed for bankruptcy protection under Chapter XI, and by operation of law, the Tax Court dismissed Debtors from those proceedings. Accordingly, Nelson now serves Debtors only on the matter before the Court.

Since the Court finds subject matter waiver with respect to the 1990 Transaction and Subsequent Events, and Nelson contributed to the 1990 Transaction, the Government may depose Nelson as to his relevant involvement. Nelson, of course, must comply with New Jersey Rules of Professional Rules of Conduct, Rule 3.7(a).

### D. Debtors' Interrogatory Responses 1, 8, and 9 Inadequately Burden the Government.

The Government argues that in response to the United States' Interrogatories 1, 8, and 9, Debtors improperly make "sweeping reference to the entirety of their document production in this litigation, exceeding 200,-000 pages, without specifying which documents, if any, are responsive to any particular interrogatory." (Mem. of Law in Supp. of United States' Motion to Compel at 28.) The Court agrees.

Rule 33(d) of the Federal Rules of Civil Procedure, "Option to Produce Business Records," provides that when an answer to an interrogatory may be derived from the business records of the served party and the burden of ascertaining that answer is substantially the same for both parties, the served party may specify the records from which the answer may be derived or ascertained. Fed.R.Civ.P. 33(d). The served party therefore has the discretion of answering an interrogatory as requested or indicating the records from which the answer may be derived.

The option afforded by Rule 33(d) is not a procedural device for avoiding the duty to give information. *R.W. Thomas Const. Management Co., Inc. v. Corrugated Services, Inc.*, 1995 WL 592539 at *1 (E.D.Pa. 1995). The responding party may not avoid answers by imposing on the interrogating party a mass of business records from which the answers cannot be ascertained by a person unfamiliar with them. *Id.* (citing 4A Moore's Federal Practice, page 33–120).

Rather, the responding party has a "duty to specify, by category and location" the records from which he knows the answers to the interrogatories can be found. *Id.* Rule 33(d) specifically requires that responding parties provide the following guidance to the interrogating party:

A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.

Fed.R.Civ.P. 33(d).

The Government contends that Debtors neglected to make the requisite specifications to Interrogatories 1, 8, and 9. Interrogatory 1 asked Debtors to "Identify each and every person who has knowledge concerning the 1990 Transaction and Subsequent Events," in addition to explaining the substance of that knowledge. (Govt. Interrogatory No. 1.)

Debtors respond by referencing the 60 boxes of documents produced to the IRS in 1997. Debtors state:

The documents in those 60 boxes further identify individuals potentially responsive to this interrogatory and evidence the nature of each such person's involvement with the issues presented...Debtors have produced or will produce additional documents in response to the United States' First Request for Production of Documents. These documents further identify individuals potentially responsive to this interrogatory and evidence the nature of each such person's involvement with the issues presented.

(Debtors' Response to Interrogatory No. 1.)

Debtors' Response fails to provide guidance for the Government and they neglect their duty to specify, by category and location, which documents in the boxes are responsive to Interrogatory No. 1. Worse, Debtors only indicate that individuals mentioned in the contained documents are *potentially* responsive to the Interrogatory thereby requiring the Government to determine on its own which documents are actually responsive.

Debtors' responses to Interrogatories 8 and 9 are similarly deficient. Interrogatory No. 8 asks Debtors to "Describe completely the actions ('due diligence') undertaken by GAF on or before February 12, 1990 to determine or verify the value of the assets

and/or business(es) . . ." (Govt. Interrogatory No. 8.) Debtors, in their Response, state:

> The nature of those efforts, and the identities of other persons involved in those efforts, are reflected in documents contained in the 50 boxes of documents produced to the IRS in 1977[sic], and in documents that have been or will be produced in response to the United States' First Set of Requests for Production of Documents.

(Debtors' Response to Interrogatory No. 8.)

Furthermore, in response to Interrogatory No. 9, which asked Debtors to identify "each asset (i.e. accounts receivable, inventory, land buildings, equipment, etc.) transferred by GAF to RPSSLP in conjunction with the 1990 Transaction," Debtors respond:

> The categories of assets transferred by GAF to RPSSLP in conjunction with the 1990 Transaction are reflected in the documents contained in the 60 boxes of documents produced to the IRS in 1997 and in the documents that have been or will be produced in response to the United States' First Set of Requests for Production of Documents.

(*Id.* at 11.)

All three Responses inadequately burden the Government to determine, on its own, which documents are responsive to which Interrogatory and in what way. Debtors are hereby ordered to issue amended responses to Government Interrogatories 1, 8, 9, following the guidelines outlined by Rule 33(d) and in accordance with the method requested by each Interrogatories, i.e. designating responsive document by Bates number.

### E. Debtors' Productions Adequately Respond to the Government's Document Requests.

The Government similarly criticizes Debtors' document productions. The Government argues that Debtors answer the United States' requests for production "by reference to over 200,000 pages of documents, without specifying which documents, if any, are responsive to which document requests." (Mem. of Law in Supp. of U.S. Motion to Compel at 30.) The Government argues that this practice violates Rule 34(b) [of the Fed-

eral Rules of Civil Procedure], which requires Debtors to "organize and label" their document production "to correspond with the categories in the request[s]" for production (*Id.* at 30.)

In seeking "specifications" for document productions as it did for Interrogatory responses, the Government ignores the difference between the Rules governing the two discovery devices. Rule 34(b) provides, "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Fed.R.Civ.P. 34(b).

■ Unlike Rule 33(d), which governs Interrogatories, Rule 34(b) does not require the responding party to make specifications for all document productions. The plain phrasing of Rule 34(b) reveals that the producing party has the option of presenting information in one of two ways. If the producing party produces documents in the order in which they were kept in the usual course of business, the Rule imposes no duty to organize and label the documents. The duty to organize and label only attaches when the responding party cannot or does not produce the documents as they were kept in the usual course of business.

Debtors contend that they produced documents as kept in the usual course of their business. (Yanofsky Decl. at ¶ 15, Debtors' Mem. in Opp. to United States' Motion to Compel at 17, 18). The Government has not contested this point.

Furthermore, the Government never alleges that Debtors' productions were so disorganized as to indicate that documents were not produced as kept in the regular course of business. The Government's position is unlike that of the requesting party in *Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories, Inc.*, 1988 WL 70013 (D.Del.1988). There, the producing party had arranged documents in bundles without designating the origin of the file, the name of the file, or whether the bundle contained documents from multiple files. The Court found that the producing party had gathered documents from different individuals and

transferred them to the requesting party in an unintelligible manner in violation of Rule 34(b). *Id.* at *4.

Instead of pointing to an inability to use the documents produced, the Government erroneously focuses on the need for organizing documents and refers to the sheer volume of the production. (Mem. of Law in Supp. of United States' Motion to Compel at 30.) These arguments fail in light of the plain phrasing of Rule 34(b). Fed.R.Civ.P. 34(b).

Debtors' production is appropriately responsive because the documents were produced as they are kept in the regular course of business.

### F. Enlargement of The Discovery Schedule Is Appropriate.

In its Memorandum of Law in Support of United States' Motion to Compel, filed March 12, 2003, the Government asked the Court to extend the discovery schedule by five months since this litigation has been "mired in controversy" over Debtors' privilege claims and interpretations of Federal Rules of Civil Procedure. The Government argued that the Court-imposed deadline of May 30, 2003 was ambitious and impractical. In its Reply Brief in Support of Its Motion to Compel, filed May 19, 2003, the Government then extended its request for extension to seven months to compensate for time lost due to the discovery hearing's postponement.

Due to the Court's multiple rulings on discovery issues that burden both parties and impact the scope of this litigation, the Court grants the Government's motion to enlarge the discovery schedule. The Court requests that the parties attempt to agree on a new discovery schedule and, failing that, meet with Magistrate Judge Arleo, who will determine the exact contours of the Government's request for enlargement of time.

### III. CONCLUSION

Finding that Debtors suffer no prejudice that would warrant a separation of trial under Federal Rule of Civil Procedure 42(b), the Court denies Debtors' Motion to Bifurcate Discovery and Trial on the Issue of Penalties. The Court also finds that Debtors have waived their attorney-client privilege with regard to the subject matter of the 1990 Transaction and Subsequent Events. Accordingly, Debtors must produce all relevant communications with Michael Baldasaro, William S. McKee, and William F. Nelson. Further, Debtors must designate which documents in their productions are responsive to The Government's Interrogatories 1, 8, and 9.

In order to facilitate compliance with the Court's findings in this Opinion, the Court grants an enlargement of the discovery schedule, to be determined by Magistrate Judge Arleo in the event the parties fail to agree.

Appropriate Orders follow this Opinion

### ORDER

This matter having come before the Court pursuant to 28 U.S.C. § 157(d); and

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

With respect to the Government's Motion to Compel Debtors' Discovery Responses and Enlarging Discovery Schedule;

It is hereby:

1. ORDERED that the United States is entitled to discovery, including depositions, with respect to all communications between Debtors and their outside tax counsel regarding the federal tax implications of the 1990 Transaction and Subsequent Events, the nature and extent of Debtors' reliance upon advice given by their outside tax counsel, and the actions taken by Debtors in reliance upon that advice.

2. ORDERED that communications between Debtors and P. Michael Baldasaro are not privileged. Debtors shall produce to the Government all communications with Baldasaro concerning the 1990 Transaction and Subsequent Events. Debtors shall also produce to the Government documents on GAF's privilege log numbered 56, 61, 64, 70,

72, 177, 191, 238, 262, 268, 269, 270, 284, 294, 351, 361, 370, and 371.

3. ORDERED that debtors shall adhere to the Court's determination that the attorney-client privilege has been waived with respect to all communications between Debtors and their outside tax counsel regarding the federal income tax implications of the 1990 Transaction and Subsequent Events and produce to the Government all relevant communications between Debtors and William S. McKee and William F. Nelson.

4. ORDERED that Debtors shall amend their response to the United States' Interrogatory No. 1 to comply with Fed.R.Civ.P. 33(d).

5. ORDERED that Debtors shall amend their response to the United States' Interrogatory No. 8 to comply with Fed.R.Civ.P. 33(d).

6. ORDERED that Debtors shall amend their response to the United States' Interrogatory No. 9 to comply with Fed.R.Civ.P. 33(d).

7. ORDERED that the Government's request for amended responses to requests for production 12 through 24 is denied.

8. ORDERED that the fact discovery cut-off, presently set for May 30, 2003 is extended. The parties shall confer to agree on a new discovery schedule and, failing that, meet with Magistrate Judge Arleo to determine the exact contours of the enlargement.

### ORDER

This matter having come before the Court pursuant to 28 U.S.C. § 157(d); and

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

Debtors' Motion to Bifurcate Discovery and Trial on the Issue of Penalties is **denied**.